AO108(2/90) Application for Seizure Warrant

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

In the Matter of the Seizure of
(Address or brief description of property or premises to be seized)

One suitcase containing about
$5.2 million in mutilated U.S. currency

## APPLICATION AND AFFIDAVIT
## FOR SEIZURE WARRANT

CASE NUMBER:

I, _____ Stephen Schneider _____ being duly sworn depose and say:

I am a(n) ___ Special Agent with the U.S. Department of Homeland Security ___ and have reason to believe
that within the jurisdiction of this Court there is now certain property that is subject to forfeiture to the United States,
namely  (describe the property to be seized)

One suitcase containing bundles of mutilated U.S. currency, estimated to be $5.2 million, which were
submitted on or about April 25 2008, to the U.S. Bureau of Engraving and Printing (BEP), which are now in a vault
in BEP's Examining and Redemption Section at 14th & C Streets, S.W., Washington, D.C.

which is/are (state one or more bases for seizure under the United States Code)

property involved in violations of: 31 U.S.C. §§ 5316, 5324 & 5332, and subject to seizure and forfeiture
pursuant to 31 U.S.C. §§ 5317 & 5332 and 18 USC § 981

The facts to support a finding of Probable Cause for issuance of a Seizure Warrant are as follows:

SEE ATTACHED AFFIDAVIT HEREIN INCORPORATED BY REFERENCE AS IF FULLY RESTATED
HEREIN

Continued on the attached sheet and made a part hereof.      ☒ YES    ☐ NO

Barry Wiegand
Asset Forfeiture Unit, Criminal Division
(202) 307-0299

_____
Signature of Affiant
Stephen Schneider, Special Agent
U.S. Department of Homeland Security

Sworn to before me, and subscribed in my presence

_____
Date

at Washington, D.C.

_____
Name and Title of Judicial Officer

_____
Signature of Judicial Officer

<u>**AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEIZURE WARRANT**</u>

I, Stephen Schneider, am a Special Agent of the U.S. Department of Homeland Security's Immigration and Customs Enforcement (ICE) Division.  After being duly sworn, I do hereby aver, depose, and state the following:

1.    I have been a federal law enforcement officer since 1996, serving with the U.S. Customs Service and its successor, Immigration and Customs Enforcement (ICE).  Before my current assignment in metropolitan Washington, D.C., I worked in offices in Nogales, Ariz., and Newark, N.J. I have investigated both international drug smuggling and money-laundering crimes and taken part in a variety of police activities, including under-cover operations, electronic surveillance and interception by judicial warrant, and execution of arrest and search warrants.  Since 2006, I have worked at a High Intensity Drug Trafficking Area (HIDTA) task force operating in the metropolitan area of Washington, D.C. During my career, I have taken part in at least 15 distinct longer-term investigations, most of which had an international scope.    Further, my duties include investigating bulk-cash smuggling, unlawful financial-structuring crimes, and schemes to evade currency-reporting rules.  Because I make this affidavit to apply for a seizure warrant, I have not included all of the information known to federal agents about the events described. What I set forth, I know from observing it personally, reading

official documents, or speaking to other sworn law enforcement agents.

## I. <u>SUMMARY</u>:

2.   I am applying for a warrant to seize a suitcase and the very large amount of U.S. currency in it, which is estimated to be $5.2 million.   Much of this currency shows signs of physical deterioration, known as "mutilation."   This "mutilated currency" was imported from Mexico and submitted on April 25, 2008, to the U.S. government's Bureau of Engraving and Printing (BEP) to be replaced with new government funds through BEP's program for redemption of mutilated currency.   The suitcase and mutilated currency now are in a vault in BEP's Examining and Redemption Section at 14th & C Streets, S.W., Washington, D.C.   The amount of "mutilated currency" has been estimated at about $5.2 million, but I am applying for a warrant to seize all currency in the suitcase, the suitcase, and any other items with them, regardless of value. In this affidavit, I refer to this property as the "Felhaber (II) currency."   This distinguishes it from $1.2 million in mutilated currency, which the same persons submitted to BEP about 14 months ago in April 2007, which I call the "Felhaber (I) currency."   I obtained a seizure warrant last month on May 28, 2008 from U.S. Magistrate Judge Alan Kay for this $1.2 million in mutilated currency.   Both amounts of mutilated currency appear to be from

-2-

the same source.   For the same reasons that I sought a seizure warrant for the $1.2 million in mutilated currency, outlined more fully below, I now am submitting this application for a warrant to seize the related $5.2 million in mutilated currency.

3.    The Felhaber (II) currency may be seized and forfeited because it is property that must have been either (1) imported into the U.S. by persons who failed to file a required report on importing currency into the U.S., in violation of 31 U.S.C. § 5316(a), or (2) involved in a violation of 31 U.S.C. § 5324(c)(2), which prohibits material omissions or misstatements of fact in this required report on importing currency into the U.S.  The report, which must be filled out when importing more than $10,000 in U.S. currency into the U.S., is called a "Report of International Transportation of Currency or Monetary Instruments." It commonly is referred to as a "CMIR" (also a FinCEN Form 105), and I call it a CMIR in the rest of this affidavit.

4.    Further, the Felhaber (II) currency II also was involved in a violation of the law against bulk-cash smuggling, 31 U.S.C. § 5332(a)(1), because it is more than $10,000, which was concealed and transported into the U.S. with the intent to evade the CMIR reporting requirement.

## II. <u>STATEMENT OF FACTS</u>:

5.    Since  August  2005,  federal  agents  have  been

-3-

investigating a group of persons working together to redeem or exchange $10-$20 million in mutilated U.S. currency imported from Mexico, which they have said was buried there for 20 or more years.   The group consists of Mr. Franz Felhaber, Mr. Jose Carillo-Valles, Ms. Esther Carillo-Valles Saenz-Pardo, and Ms. Xochitl Carillo-Valles, all of whom are related by blood or marriage.  Since August 2005, members of this group have tried to redeem or exchange batches of mutilated currency at least six times, both through BEP in Washington, D.C., and at various banks in El Paso, Texas.  The physical characteristics of each batch of mutilated currency show that it comes from the same source.   In their efforts, one or more of the group has: (1) made material omissions or misstatements on CMIR reports about importing the currency from Mexico; (2) given misleading or conflicting information about who owns the currency, on whose behalf redemption is being sought, and about the money's origins; and, (3) used a false name and other deception or trickery.  Throughout these efforts, the group's members appear to have violated U.S. laws requiring that reports be made when large sums of cash are imported into this country and that the reports be accurate and truthful.  All of this appears to be an effort to conceal the money's origins and ownership in Mexico.

6.   Mr. Jose Carillo-Valles works for Mr. Felhaber in his

-4-

customs brokerage business in El Paso.  Mr. Carillo-Valles appears
to be Mr. Felhaber's uncle.  Ms. Xochitl Carillo-Valles appears to
be Mr. Carillo-Valles's sister, and Ms. Esther Carillo-Valles
Saenz-Pardo is his wife.  Ms. Esther Carillo-Valles also has a
family name of Saenz-Pardo or Saenzpardo, which might be her
maiden name.  Mr. Jose Carillo-Valles sometimes is called by
variations of this name, such as Jose Carillo and Jose C. Valles.
I refer to him as Mr. Carillo-Valles in this affidavit.
Similarly, in some reports, Ms. Esther Carillo-Valles Saenz-Pardo
is not given all these names, but I have adopted the convention of
using this entire name.

      7.  The Bureau of Engraving and Printing (BEP) is part of
the U.S. Treasury Department.  By law, BEP conducts a program to
redeem "mutilated" U.S. currency, taking in damaged cash and
replacing it with fresh money from government funds.  According to
an official BEP report:

> Mutilated currency is defined as currency notes which
> are either not clearly more than 50% of the original
> note or in a condition that the value is questionable
> and therefore special examination is required to
> determine the value.  Mutilation can occur through
> interactions with fire, water, chemicals, and animals .
> . . . Badly soiled, limp, defaced, torn, or worn notes
> that are clearly more than 50% of the original note and
> do not require special examination are not considered
> mutilated currency and can be redeemed at any bank.
> [BEP] is allowed, under regulations by the Department of
> the Treasury, to exchange mutilated currency at face
> value . . . . Mutilated currency may be mailed or

brought personally to the BEP with a letter stating the estimated value and the explanation of how the currency became mutilated.

8.   To show the pattern of activity regarding the "buried" U.S. cash imported from Mexico, I recount chronologically the several times one or more members of the Felhaber/Carillo-Valles group have tried to exchange mutilated currency in Texas or Washington, D.C., as well as the conflicting statements that Mr. Felhaber and the Carillo-Valles's variously have made about the mutilated currency.  The culmination (thus far) of these efforts occurred on April 25, 2008, when Mr. Felhaber and Ms. Xochitl Carillo-Valles submitted the $5.2 million in mutilated Felhaber (II) currency to BEP for redemption, the property for which I seek a seizure warrant.

A. *$120,000 exchanged in August 2005*:

9.   In late August 2005, Mr. Felhaber met with an officer of the Federal Reserve Bank's El Paso branch.  Mr. Felhaber said that he was a customs broker, but wanted to help two clients, Mr. Jose Carillo-Valles and Ms. Esther Carillo-Valles Saenz-Pardo, in exchanging damaged currency.  According to Mr. Felhaber, his clients had found buried money on their property in Juarez, Chihuahua, in Mexico.  The bank official told Mr. Felhaber to contact the Federal Reserve in Washington, D.C.

10.  Later, Mr. Felhaber again called this bank employee to

say that Federal Reserve officials in Washington, D.C., had said that the El Paso branch should take the money.  The El Paso Federal Reserve officer said that he could not exchange the currency until he had verified Mr. Felhaber's story.

11.  On about August 29, 2005, Mr. Felhaber, Mr. Jose Carillo-Valles, and Ms. Esther Carillo-Valles Saenz-Pardo went to the El Paso Federal Reserve branch.  They met with a different bank employee.  During the meeting, the three produced $120,000 in mutilated currency, which Ms. Carillo-Valles Saenz-Pardo had in her purse.  Mr. Carillo-Valles said that they had found the money while digging to expand the foundation of a building they owned in Juarez, Mexico.  Ms. Carillo-Valles Saenz-Pardo said that they had found millions of dollars.

12.  According to the second bank employee, Mr. Felhaber also claimed that the first bank officer had agreed that the Federal Reserve Bank would exchange the money.  That first bank officer later called Mr. Felhaber's statement untrue, however, and has said that he had told Mr. Felhaber the opposite.

13.  Ultimately, the second bank official agreed to exchange the twelve bundles of mutilated currency because she feared the group might be robbed if they left the bank with so much cash.  When the El Paso Federal Reserve bank exchanged the $120,000, it sent the funds to a Bank of America account in Mr. Carillo-

Valles's name.

    B. _Attempt to exchange currency through Bank of America in September 2005_:

    14.  In September 2005, an El Paso Bank of America vice president reported that Mr. Felhaber, Mr. Carillo-Valles, and Ms. Esther Carillo-Valles Saenz-Pardo had tried to exchange damaged currency.  Mr. Felhaber said that he was helping Mr. Carillo-Valles and Ms. Carillo-Valles Saenz-Pardo as an "after-hours favor."  Mr. Felhaber also said that he had several million dollars in mutilated money in Mexico that he wanted to exchange. Mr. Felhaber was persistent about exchanging the currency and asked Bank of America to hire an armored truck to get the money at the Mexican border.  Ultimately, nothing further came of this contact with Bank of America.

    C. _Attempt to exchange $10,000 through Bank of The West in September 2005_:

    15.  In early September 2005, a man who said he was Ken Motley tried to exchange about $10,000 in damaged currency at an El Paso branch of Bank of The West.  A bank employee since has identified a photograph of Mr. Felhaber as the man who said he was Ken Motley.  Using this false name, Mr. Felhaber/Motley spoke to a bank vice president about exchanging currency.  In doing so:

        (a) Mr. Felhaber/Motley said that he had been digging up a tree on his relative's property in Chihuahua, Mexico, and discovered buried money.  The buried money was at least $2.5 million, with more still being counted.

-8-

(b)  Mr. Felhaber/Motley offered to pay the vice president to exchange the currency. After the vice president said that the bank charged no fee for such an exchange, but still could not handle this one, Mr. Felhaber/Motley repeated his offer to pay the vice president.

16.  On September 12, 2005, and September 15, 2005, another Bank of The West employee received two phone calls from a man who said he was Ken Motley. The first time "Motley" spoke with a heavy Spanish accent. The second time, he did not. Mr. Motley said that he had $20 million in damaged U.S. currency, which he wanted to exchange. I suspect that Mr. Motley really was Mr. Felhaber.

D. *$300 in currency exchanged in September 2005*:

17.  Also in early September 2005, a man who said he was Ken Motley went to a First National Bank branch in El Paso. I believe that this person was Mr. Felhaber. Mr. Felhaber/Motley asked a bank teller to exchange three mutilated $100 bills. The teller did so. Mr. Felhaber/Motley thereafter returned to this First National Bank branch later in September 2005. Mr. Felhaber/Motley said that a friend from Mexico had discovered a buried suitcase on his property, which contained about $20 million dollars of unfit $100 bills in an alfalfa field. Mr. Felhaber/Motley asked if he could exchange three $100 notes, but the bank declined to do so.

E. *Mr. Felhaber's Statements to ICE Agents*:

18.  Mr. Felhaber spoke on October 17, 2005, with the El Paso

Port Director for U.S. Customs and Border Protection (CPB).  Mr.
Felhaber asked how to import large sums of mutilated money.  Mr.
Felhaber said that the money belonged to a client's grandmother
and had been stolen.  According to Mr. Felhaber, the money had
been buried in a coffin and had deteriorated as the coffin was old
and not properly sealed.

19.  ICE agents interviewed Mr. Felhaber on October 24, 2005.
During the interview, ICE agents learned the following:

(a) Mr. Felhaber said he was currently working for
Francisco Javier Ramos Saenz-Pardo, helping him import
large quantities of damaged currency to be exchanged for
new money.  Mr. Felhaber was doing this with his uncle,
Mr. Jose Carillo-Valles.  Mr. Felhaber estimated that
Mr. Ramos Saenz-Pardo had about $10 million.

(b) Mr. Felhaber believed Mr. Ramos Saenz-Pardo's $10
million once had belonged to someone else who made it
selling a property in Mexico in the 1970s, which yielded
$20 million.  This money then was buried in a coffin on
another piece of land in Mexico.  When Mr. Ramos Saenz-
Pardo bought yet a different property in Mexico, he
found a map of the coffin's location.

(c) Mr. Ramos Saenz-Pardo had approached Mr. Carillo-
Valles and offered him 25% to get the mutilated money
exchanged for good money.  For each "load" of mutilated
money that Mr. Felhaber arranged to import and exchange
for Mr. Ramos Saenz-Pardo, Mr. Felhaber was to receive
$5000 in payment.

(d) Mr. Felhaber admitted that he already had imported
$125,000 in damaged currency into the U.S. from Mexico.
Mr. Felhaber, Mr. Carillo-Valles, and Ms. Esther
Carillo-Valles Saenz-Pardo had imported the money and
filled out a CMIR when doing so.  Neither Mr. Carillo-
Valles nor his wife owned this money, which belonged to
Mr. Ramos Saenz-Pardo.  I believe that Mr. Felhaber was
referring to the $120,000 exchanged in late August 2005

-10-

at the El Paso Federal Reserve bank, as described above.

(e) Mr. Felhaber said that he would not try to exchange money that he thought was "illegal" because it would harm his main customs broker business.

F. _Redemption of $136,450 through BEP in January 2006_:

20.  On January 4, 2006, a CMIR for $136,000 was filed with the U.S. government in Santa Theresa, New Mexico, which is very near El Paso, Texas.  The CMIR states that the money was imported for "Carillo, Jose Valles" and the amount of the "damaged currency" was $136,000.  The CMIR is signed "Xochitl Carillo Valles."  In January 2006, BEP received a typed letter with a Mexican address dated January 3, 2006, over a signature from Jose Carillo.  The letter submitted about $136,000 in mutilated U.S. currency.  All of this came to BEP in a package sent from Texas. The return address was to Jose Carillo Valles at Mr. Felhaber's business address, the same one used when Ms. Xochitl Carillo-Valles and Mr. Felhaber submitted the Felhaber (I) currency to BEP in April 2007.  The letter stated:

> The following serves to submit currency that was stored in a basement for 22 years (approx.).  After several discussions with our attorney and the Mexican government, we are submitting this currency . . . .  We have submitted documents given to the Mexican and U.S. Government to comply with all laws . . .

> In the future we would like to submit this money into our bank as prescribed by your web page.  Due to the volume of money we are unable to ship more than $1,000,000 USD per shipment.  This is due too [sic] the fact that the people employed to transport to the U.S.A.

-11-

do not have more insurance to cover this money. . . .
If you should have any questions please feel free to
call my attorney . . . . [name and phone omitted].

21.   Two months later, BEP redeemed the mutilated currency,
after finding that it totaled $136,450.  In March 2006, the U.S.
government issued a check to Mr. Jose C. Valles, which BEP sent to
Mr. Felhaber's business address in El Paso, Texas.  I have seen a
copy of the check, which shows that it was deposited into Mr.
Carillo-Valles's Bank of America account.  Further, descriptions
of the physical characteristics of the $136,450 in mutilated
currency are consistent with those of the $120,000 in mutilated
currency, which the El Paso Federal Reserve branch exchanged on
August 29, 2005, for Mr. Felhaber and Mr. and Mrs. Carillo-Valles.
So, too, does the description of the packaging of the two amounts
of mutilated currency.  I believe that both amounts of mutilated
currency came from the same "buried" source.

G.   *Mr. Carillo-Valles's statements to ICE Agents*:

22.   About six months after BEP had redeemed the $136,450 in
mutilated currency, ICE agents spoke to Mr. Jose Carillo-Valles on
September 13, 2006.  Mr. Carillo-Valles said he worked as a runner
at an import broker business owned by his uncle, F. C. Felhaber.
When ICE agents asked about the $136,000 in mutilated currency
sent to BEP in January 2006, Mr. Carillo-Valles denied ever
sending money to BEP or receiving money from BEP.  Mr. Carillo-

-12-

Valles denied making deposits or exchanging money for anyone else and said he only deposits money into his own Bank of America account.  Mr. Carillo-Valles said he opened this account with $123,000, which he got in August 2005 as an inheritance from his grandfather, who had died 20 years earlier.  In context, I believe Mr. Carillo-Valles referred to the $120,000 exchanged at the El Paso Federal Reserve on August 29, 2005.

23.  Mr. Carillo-Valles said he had obtained his inheritance through arrangements made by Mr. Felhaber.  According to Mr. Carillo-Valles, Mr. Felhaber had told him that some men were looking for him to give him an inheritance.  But, Mr. Carillo-Valles never ultimately met these men.  That was because Mr. Felhaber handled the delivery of the money.  Mr. Felhaber gave Mr. Carillo-Valles the "inheritance" cash, and it was transported into the U.S. through Santa Teresa, N.M., according to Mr. Carillo-Valles, who said that it had been declared to the U.S. government. After it had been exchanged at the El Paso Federal Reserve branch, according to Mr. Carillo-Valles, the money was deposited into his Bank of America account, but Mr. Felhaber only let him keep $10,000.  The rest went to fees for finding Mr. Carillo-Valles and getting the inheritance to him.  The inheritance story differs completely from what Mr. Felhaber and the Carillo-Valles's told the El Paso Federal Reserve officer when the $120,000 in damaged

currency was exchanged.  Further, in my experience, Mr. Carillo-Valle's account of his "inheritance" is consistent with him actually acting as a nominee owner of the exchanged currency on behalf of another person, who was the currency's true owner.

24.  On November 9, 2006, ICE agents interviewed Ms. Esther Carillo-Valles Saenz-Pardo.  She said she knew nothing of the $136,000 in mutilated currency, which her husband supposedly had sent to BEP in January 2006.  With regard to the $120,000 exchanged in August 2005, Mrs. Carillo-Valles Saenz-Pardo said that her husband had given her the money in Juarez, Mexico, and told her to put it in her purse.  They then took it to the Federal Reserve Bank in El Paso.  Mrs. Carillo-Valles Saenz-Pardo said the money came from her husband's inheritance from his father and mother.  She said that her father-in-law had died 14 years earlier, and she gave the date of her mother-in-law's death, and I know that date was five months _after_ the "inheritance" money was exchanged in August 2005.  Reminded that she had told Federal Reserve employees that the $120,000 had been buried, Mrs. Carillo-Valles Saenz-Pardo said that she did not know if the money was found or if it was an inheritance.

25.  ICE agents asked about wire transfers from Mr. Carillo-Valles's Bank of America account just after the exchanged $120,000 had been deposited into it in August 2005.  One wire transfer was

sent to a person named Saenz-Pardo, who Mrs. Carillo-Valles Saenz-Pardo thought was a relative of her father's.    To me, this indicates that the money actually belonged to a person named Saenz-Pardo, as Mr. Felhaber told ICE agents in October 2005, rather than being Mr. Carillo-Valles's inheritance.    I find the story about an "inheritance" even more remarkable because Mr. Carillo-Valles's father had died many years before, and his mother was still alive when the "inheritance" was exchanged at the El Paso Federal Reserve branch.

### H.  *$1.2 million in mutilated currency Felhaber (I) Currency to BEP for Redemption in April 2007*:

26.    On April 6, 2007, a man and woman together presented themselves at BEP's offices in Washington, D.C., to take part in the Bureau's program to redeem mutilated currency.    The man identified himself as Mr. Franz Felhaber, and the woman said that she was Ms. Xochitl Carrillo-Valles.

27.    Ms. Carrillo-Valles had an envelope with about $1300 in mutilated U.S. currency, and Mr. Felhaber produced a much large sum of mutilated currency.    Together, Ms. Carrillo-Valles and Mr. Felhaber estimated the money to be $1.2 million.    Mr. Felhaber and Ms. Carrillo-Valles said that the money had become "mutilated" by being buried for a long time in another country.

28.    When Mr. Felhaber and Ms. Carrillo-Valles gave BEP the damaged cash, they got a formal "Receipt – Hand Deliveries of

-15-

Currency."  It lists "Xochitl Carrillo Valles" as the claimant and states that "$1.2 million dollars approx" is claimed.    Mr. Felhaber's name and phone number are on the receipt, too.  For the claimant's address the couple gave Mr. Felhaber's business address in El Paso.  Ms. Carillo-Valles's signature is on another form.

29.  I have checked U.S. government records and found that a CMIR was filed on April 3, 2007, at the border at Santa Theresa, New Mexico.  The handwritten name of the person making the CMIR is "Carillo, Xochitl Valles."  In the same handwriting, the CMIR gives "Information about person(s) or business on whose behalf importation or exportation was conducted."  It states "Carillo, Jose Valles."  I consider this to be an omission or misstatement because Mr. Felhaber has said that the mutilated currency belongs to Mr. Francisco Javier Ramos Saenz-Pardo, and that Mr. Felhaber and the Carillo-Valles's are redeeming the currency on his behalf.

30.  In the same handwriting, the Felhaber (I) currency CMIR describes the funds being imported as "mutilated currency" in an amount "to be determined by Bureau of Engraving and Printing" in Washington, D.C.  On the CMIR, there is a signature "Xochitl Carillo Valles."  The signature on this CMIR matches that on the BEP form of April 6, 2007.  I consider this information to be an omission or misstatement, because less than two days later, Ms. Carillo-Valles and Mr. Felhaber claimed at BEP to know that the

-16-

amount of mutilated currency was $1.2 million.

31.  Next, about a year later, Ms. Xochitl Carillo-Valles and Mr. Felhaber brought an estimated $5.2 million in mutilated currency to BEP for redemption on April 25, 2008.  I have been unable to find a CMIR filed for this $5.2 million currency.  If this currency was imported in April 2007, with the $1.2 million submitted to BEP that same month, then I regard it as a further sign that the original CMIR's statements were highly misleading.

32.  Between April 6 and December 13, 2007, BEP Investigator Richard Hattauer has examined the Felhaber (I) currency.  The money was almost all U.S. $100 notes, with most bills issued from 1977 to 1981.  Descriptions of the physical characteristics of the $1.2 million Felhaber (I) mutilated currency are consistent with descriptions of the $136,450 that BEP redeemed in March 2006 for Mr. Carillo-Valles and the $120,000 that the El Paso Federal Reserve branch exchanged in August 2005 for Mr. Felhaber and the Carillo-Valles's.  These facts indicate to me that all of the mutilated "Felhaber" currency was from the same source.

I. *Felhaber (II) Mutilated Currency Submitted to BEP for Redemption on April 25, 2008*

33.  Submitting the Felhaber (I) currency to BEP for redemption in April 2007 was not the first time the Felhaber/Carillo-Valles group had imported "buried" mutilated cash from Mexico, nor was it the last.  On April 25, 2008, persons who

-17-

said they were Mr. Felhaber and Ms. Xochitl Carillo-Valles submitted in person the estimated $5.2 million mutilated Felhaber (II) currency to BEP for redemption.

34. In trying to redeem this mutilated currency, Mr. Felhaber said that it belonged to Ms. Xochitl Carillo-Valles's brother, whom I take to be Mr. Jose Carillo-Valles.  I regard this as a misstatement in the same vein as similar assertions on related CMIRs, especially the "Felhaber (I) currency" CMIR filed in April 2007.  Mr. Felhaber said that the $5.2 million came from the same source as the earlier submitted $1.2 million, that is, the "Felhaber (I) currency" for which U.S. Magistrate Judge Kay issued a seizure warrant on May 28, 2008.  Mr. Felhaber said that the money had been buried, that it had come from Mexico, and that he had an additional $1 million in damaged U.S. currency.  The physical characteristics of this $5.2 million in mutilated currency are consistent with that of the batches of mutilated currency that the Felhaber group previously has tried to exchange or redeem at El Paso banks and BEP.

35.  I have researched whether any CMIR ever was filed for the importation of the $5.2 million Felhaber (II) currency and whether any of Felhaber/Carillo-Valles group ever filed a CMIR for importation of a roughly similar amount of mutilated currency.  My research shows that none of Mr. Felhaber, Ms. Xochitl Carillo-

Valles, or Mr. Jose Carillo-Valles has filed a new or separate CMIR for importing currency since the one filed more than 14 months ago in April 2007, which I have associated with the importation of the $1.2 million Felhaber (I) currency.

36.  It appears to me that one of two things must logically be true: (1) either no CMIR ever was filed for the $5.2 million Felhaber (II) currency; or, (2) the CMIR filed in April 2007, which I associate with the $1.2 million Felhaber (I) currency, was meant to report both the $1.2 million mutilated Felhaber (I) currency and the $5.2 million mutilated Felhaber (II) currency.

## III. <u>CONCLUSION</u>:

37.  Through independent research, I have learned that $1 million in $100 notes – 10,000 such notes – weighs about 22 pounds.  A single stack of 10,000 $100 notes is about three and a half feet tall – 43 inches.  Therefore, $20 million would weigh more than 440 pounds, in excess of a fifth of a ton.  Among the stories Mr. Felhaber has given about the buried money was that it was found in a suitcase in an alfalfa field.  Aside from such a suitcase's considerable weight, it also must hold about seven cubic feet, that is, have dimensions of about 43 inches by about 52 inches by about six inches, or a variation of this, such as 43 inches by 26 inches by 12 inches – or roughly three-and-half feet by more than two feet by about one foot.

38.    Based upon all the facts set forth here, I believe that Mr. Felhaber and the Carillo-Valles family are trying to use BEP's redemption program effectively to launder the proceeds of criminal activity into payments by check from the U.S. Treasury.  From the descriptions I have seen of the mutilated currency (1) exchanged through the El Paso Federal Reserve in August 2005, (2) sent to BEP in January 2006, and the quantities of mutilated currency submitted to BEP in (3) April 2007 ($1.2 million Felhaber (I) currency) and again on (4) April 25, 2008 ($5.2 million Felhaber (II) currency), all of this cash appears to have come from the same source, apparently having been buried in Mexico for decades. I am aware that Mexican drug traffickers have been known to bury cash proceeds of drug-trafficking and also to hide cash proceeds in the walls of houses.  Given that the money is coming north from Mexico, that both conflicting and wild stories have been told about its origins, and that all the stories of how it got to be found are fantastical, I strongly suspect that the Felhaber (II) currency is the proceeds of illegal bulk narcotics sales.  The group trying to redeem the Felhaber (II) currency, not to mention the $1.2 million Felhaber (I) currency submitted for redemption in April 2007, is shooting for the "gold standard" in cleaning tainted funds, literally -- criminal money laundered into a U.S. Treasury check through the Bureau of Engraving and Printing's

-20-

redemption program.

39. Beyond my suspicions as a law enforcement agent, however, the Felhaber (II) currency certainly is subject to seizure and forfeiture even if I cannot conclusively show that it is illegal drug proceeds. No CMIR appears to have been filed for the Felhaber (II) currency. If the CMIR filed in April 2007 just before the $1.2 million Felhaber (I) currency was presented to BEP, was intended to cover the $5.2 million Felhaber (II) currency also, then that April 2007 CMIR contains material omissions and misstatements of fact, in violation of 31 U.S.C. § 5324(c)(2), particularly when it states that the currency was being imported on behalf of Mr. Jose Carillo Valles. Further, the entire course of conduct by Mr. Felhaber and the Carillo-Valles's, plus their admissions, show that they are engaged in transporting vast sums of U.S. currency from Mexico to the U.S. with the intent to evade currency reporting requirements, in violation of 31 U.S.C. § 5332(a)(1) (bulk cash smuggling). On both of these grounds, the Felhaber (II) currency is subject to seizure and forfeiture, pursuant to 31 U.S.C. §§ 5317(c) and 5332(c).

## IV. APPLICABLE STATUTES:

40. Pursuant to 31 U.S.C. § 5316, a person, his agent, or bailee who "transports . . . monetary instruments of more than $10,000 at one time" to "a place in the United States from or

through a place outside the United States" must make a report to the U.S. government.  The reports are known as CMIRs, and U.S. currency is a monetary instrument.  31 U.S.C. § 5312((a)(3)(A); 31 C.F.R. § 103.23 (requiring "CMIR" to be filed with U.S. Customs and Border Protection.)

41.  Section 5316 requires that CMIRs contain the following information:

> (1) the legal capacity in which the person filing the report is acting.
> (2) the origin, destination, and route of the monetary instruments.
> (3) when the monetary instruments are not legally and beneficially owned by the person transporting [them], or if the person transporting [them] personally is not going to use them, the identity of the person that gave the instruments to the person transporting them . . . .
> (4) the amount and kind of monetary instruments transported. . . .

42.  Pursuant to 31 U.S.C. § 5324(c) *International monetary instrument transactions* – No person shall, for the purpose of evading the reporting requirements of section 5316 – . . .

> (2) file or cause or attempt to cause a person to file a report required under section 5316 that contains a material omission or misstatement of fact; . . .

Property involved in or traceable to either a § 5316 or a § 5324 violation, or a conspiracy to commit one, may be seized and forfeited under the procedures in 18 U.S.C. § 981(a)(1)(A).  31 U.S.C. § 5317(c)(2).

43.   It is illegal when a person "with the intent to evade a currency reporting requirement under 31 U.S.C. § 5316, knowingly conceals" more than $10,000 in currency and transports such currency from outside the U.S. to a place in the U.S.  31 U.S.C. § 5332(a)(1).  As a result, 31 U.S.C. § 5332(c)(1) authorizes the seizure and forfeiture of any property involved in, or traceable to violations of 31 U.S.C. § 5332(a), or a conspiracy to violate the statute.   This seizure and forfeiture are governed by 18 U.S.C. § 981(a)(1)(A).   31 U.S.C. § 5332(c)(2).

44.   The federal regulations governing the BEP's redemption of mutilated paper currency appear at 31 C.F.R. § 100.5, *et seq.*, which run through 31 C.F.R. § 100.9.

45.   Based  upon  the  information  in  this  affidavit,  I respectfully submit that there is probable cause to believe that the mutilated "Felhaber (II) currency" is subject to seizure and forfeiture,  pursuant  to  federal  statutes,  including  but  not limited to 31 U.S.C. §§ 5317 & 5332 and 18 U.S.C. § 981(a)(1)(A). Therefore, I respectfully request that a warrant issue to seize

what I have described as the mutilated Felhaber (II) currency.

FURTHER THAN THIS, affiant sayeth not.

_____
Stephen A. Schneider, Special Agent
United States Department of Homeland Security
Immigration and Customs Enforcement

* * * * * * *

Subscribed to and sworn before me on this _____ day
of June 2008.

_____
UNITED STATES MAGISTRATE JUDGE